**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BLACK LIVES MATTER D.C., *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 20-cv-1469 (DLF) |
| DONALD J. TRUMP, *et al.*, | |
| *Defendants.* | |
| RADIYA BUCHANAN, *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 20-cv-1542 (DLF) |
| DONALD J. TRUMP, *et al.*, | |
| *Defendants.* | |
| ISABELLA KAVANAGH, | |
| *Plaintiff*, | |
| v. | No. 20-cv-2163 (DLF) |
| DONALD J. TRUMP, *et al.*, | |
| *Defendants.* | |
| RYAN ROTH, | |
| *Plaintiff*, | |
| v. | No. 20-cv-1622 (DLF) |
| DONALD J. TRUMP, *et al.*, | |
| *Defendants.* | |

## MEMORANDUM OPINION

These lawsuits arise out of the law enforcement response to protests in Lafayette Square on June 1, 2020.  In these related cases, four sets of plaintiffs bring various constitutional and statutory claims against federal and state officials and agencies, including former President Trump, seeking both damages and injunctive relief.  Before the Court are fifteen motions to dismiss.  For the reasons that follow, the Court will grant the motions in part and deny the motions in part.

## I.    BACKGROUND

### A.    Factual Allegations

Though the parties dispute various facts as alleged in the complaints, in deciding these motions to dismiss, the Court must accept as true all material factual allegations in the complaints.  *See Am. Nat. Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).  At this stage of the proceedings, the Court will not accept the defendants' invitation to consider facts not explicitly alleged in the complaints.[1]

---

[1] For example, some of the defendants ask the Court to consider news articles referenced in the complaints that recount in detail the unrest and rioting that preceded the June 1 events in the District of Columbia.  *See, e.g.*, D.C. Defs.' Mot. to Dismiss at 4–7, Dkt. 54-1 (No. 1542); *see also* Buchanan Am. Compl. ("FAC") ¶ 46, Dkt. 29 (No. 1542) (alleging that "rioting, looting, and property damage" occurred the night before, in the area of Lafayette Square).  They also point to the factual findings in Mayor Muriel Bowser's May 31, 2021 order implementing a citywide curfew beginning at 7:00 p.m. on June 1, 2020.  D.C. Defs.' Mot. to Dismiss at 5–6 (No. 1542).  The Court will not consider these disputed allegations because they are not integral to the plaintiffs' claims.  *See Gonzalez Boisson v. Pompeo*, 459 F. Supp. 3d 7, 12 (D.D.C. 2020).  Nor would they affect the outcome here.

The plaintiffs[2] allege that "peaceful protesters assembled in historic Lafayette Park across from the White House" to protest racial injustice after the death of George Floyd and other Black people at the hands of law enforcement.  *See* Buchanan Am. Compl. ¶ 1 ("FAC"), Dkt. 29 (No. 1542).  They further allege that, in response to the peaceful protest, "officials, wielding batons, sprayed the crowd with tear gas, flash-bang grenades, smoke bombs, and rubber bullets."  *Id.*  To the extent that any of the plaintiffs allege that the law enforcement officers provided warnings before dispersing the crowd, *see, e.g., id.* ¶ 56, they allege that these warnings were "futile and inadequate," *id.*, because they were given "via a megaphone approximately 50 yards away from the closest protestors," *id.*, and were "barely audible," *id.*

Though the plaintiffs urge the Court to consider the defendants' changing justifications for clearing Lafayette Square, *see id.* ¶¶ 89–95, according to the Black Lives Matter ("BLM") plaintiffs, the "professed purpose" of this law enforcement response was "to clear the area to permit the President to walk to a photo opportunity at a nearby church," BLM Third Amended Complaint ¶ 4 ("TAC"), Dkt. 52 (No. 1469).  Indeed, after Lafayette Square was cleared, President Trump, "the President's Chief of Staff, the Attorney General, the Secretary of Defense, the President's daughter, and senior advisors walked from the White House to St. John's Church on Lafayette Square," *id.* ¶ 203, where the President gave brief remarks and paused for a photo, *id.*  The plaintiffs also catalog statements that former President Trump made both before and after the events of June 1—in public tweets and in private discussions with governors—that allegedly show hostility to racial justice protestors.  *See, e.g.*, FAC ¶ 51 (quoting

---

[2] The Court will use the plural term "plaintiffs" to refer to claims and allegations that are virtually identical in the four complaints but will note any meaningful distinctions between them.

former President Trump instructing state governors: "You have to dominate.  If you don't dominate, you're wasting your time.").

The plaintiffs further allege that "[t]he Department of Justice has officially acknowledged that Defendant Barr ordered Lafayette Square cleared minutes before the assault started."  TAC ¶ 5; *see also* FAC ¶ 55 ("Barr personally ordered law enforcement personnel to extend the security perimeter around the White House and clear the streets around Lafayette Park.").  "United States Park Police Major Mark Adamchik was the incident commander during this event and gave directives to and had authority over other officers present."  FAC ¶ 55 (internal quotation marks omitted).  In addition to U.S. Park Police officers, U.S. Secret Service agents, Federal Bureau of Prisons officials, Arlington County Police Department officers, and members of the District of Columbia National Guard helped clear Lafayette Square.  *Id.* ¶ 4.  The Buchanan plaintiffs also allege that District of Columbia Metropolitan Police Department (MPD) Officers assisted in the Square.[3]  *Id*.

"The unprovoked violence caused what news reports described as a blind panic" as the crowd dispersed from Lafayette Square.  *Id.* ¶ 58 (internal quotation marks omitted).  The crowd fled Lafayette Square to be met by additional District of Columbia MPD officers who deployed tear gas on the fleeing crowd.  *See* TAC ¶¶ 100–04.  The plaintiffs allege that they suffered injuries, both physical and psychological, as a result of the law enforcement response to the protest.  For example, Isabella Kavanagh suffered second-degree chemical burns on her legs as a result of a chemical grenade that exploded as she stood "frozen with fear."  Kavanagh Compl. ¶ 39, Dkt. 1 (No. 2163).  Other plaintiffs remain "deeply disturbed and shaken" as a result of the

---

[3] As this Memorandum Opinion will discuss *infra*, there is also some dispute about whether the D.C. defendants were personally involved in clearing Lafayette Square.

law enforcement response.  FAC ¶ 87.  And in general, the plaintiffs "fear further retaliation in the future," *id.* ¶ 129, "if they continue to observe, record, or participate in constitutionally protected activity," *id.*

### B.    Procedural History

Soon after the June 1, 2020 incident, the plaintiffs brought suit in these four related cases, two of which are now consolidated.  *See* Minute Order of January 18, 2021, No. 20-cv-01622 (granting motion to consolidate *Roth* and *Kavanagh*).  The *Black Lives Matter* plaintiffs have since filed a second and third amended complaint, *see* TAC, as well as a motion for class certification, Dkt. 47 (No. 1469), while the *Buchanan* plaintiffs have filed a first amended complaint, *see* FAC.  As requested by the parties, the Court will defer a ruling on the Black Lives Matter plaintiffs' stayed motion for class certification and will permit the opposing parties 30 days after this ruling to respond to the pending motion.  *See* Minute Order of September 3, 2020.

Before the Court are 15 motions to dismiss filed by the defendants—including the former President, the former Attorney General, officials in the U.S. Park Police, D.C. National Guard, U.S. Secret Service, and the Federal Bureau of Prisons, the Arlington County Police Department, and the District of Columbia MPD; and sued in their official capacity, the Secretary of Defense, the Chief of the U.S. Park Police, the Director of the U.S. Secret Service, the Commanding General of the D.C. National Guard, and the Director of the Federal Bureau of Prisons.  The Court held a hearing on the motions on May 28, 2021.  *See* Hrg. Tr. at __.[4]  For the reasons that follow, the Court will grant the motions in part and deny the motions in part.

_____

[4] The Court will publish an updated opinion with the final hearing transcript citations once the official transcript has been produced.

## II.    LEGAL STANDARDS

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss an action for lack of subject-matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  Federal law empowers federal district courts to hear only certain kinds of cases, and it is "presumed that a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins.*, 511 U.S. 375, 377 (1994).  When deciding a Rule 12(b)(1) motion, the court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged, and upon such facts determine [the] jurisdictional questions." *Am. Nat. Ins.*, 642 F.3d at 1139 (citations and internal quotation marks omitted).  But the court "may undertake an independent investigation" that examines "facts developed in the record beyond the complaint" in order to "assure itself of its own subject matter jurisdiction." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005) (internal quotation marks omitted).  A court that lacks jurisdiction must dismiss the action.  Fed. R. Civ. P. 12(b)(1), 12(h)(3).

Rule 12(b)(3) "instructs the court to dismiss or transfer a case if venue is improper or inconvenient in the plaintiff's chosen forum." *Sanchez ex rel. Rivera-Sanchez v. United States*, 600 F. Supp. 2d 19, 21 (D.D.C. 2009).  The Court accepts the plaintiff's well-pleaded allegations regarding venue as true and draws reasonable inferences from those allegations in favor of the plaintiff. *See Abraham v. Burwell*, 110 F. Supp. 3d 25, 28 (D.D.C. 2015).  "The court need not, however, accept the plaintiff's legal conclusions as true, and may consider material outside of the pleadings." *Id.* (citation omitted).  "The plaintiff has the burden to establish that venue is proper since it is his obligation to institute the action in a permissible forum." *Sanchez-Mercedes v.*

*Bureau of Prisons*, 453 F. Supp. 3d 404, 414 (D.D.C. 2020) (internal quotation marks omitted), *aff'd*, No. 20-5103 (D.C. Cir. June 2, 2021).

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss the complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This standard does not amount to a specific probability requirement, but it does require "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").  A complaint need not contain "detailed factual allegations," *Iqbal*, 556 U.S. at 678, but alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility," *id.* (internal quotation marks omitted).

Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted).  The assumption of truth does not apply, however, to a "legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).  An "unadorned, the defendant-unlawfully-harmed-me accusation" is not credited, *id.*; likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Ultimately, "[d]etermining whether a

complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

When deciding a Rule 12(b)(6) motion, the court may consider only the complaint itself, documents attached to the complaint, documents incorporated by reference in the complaint, and judicially noticeable materials. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). A Rule 12(b)(6) dismissal "is a resolution on the merits and is ordinarily prejudicial." *Okusami v. Psychiatric Inst. of Wash., Inc.*, 959 F.2d 1062, 1066 (D.C. Cir. 1992).

## III. ANALYSIS

The defendants seek to dismiss the complaints principally on the grounds that the constitutional and statutory claims are not justiciable and that the individual defendants are entitled to qualified immunity. The Court will first address the claims against the federal defendants, followed by the claims against the D.C. and Arlington defendants.

### A. Federal Defendants

The plaintiffs together bring four categories of claims against the federal defendants. They seek (1) damages under *Bivens* and (2) injunctive relief for various alleged constitutional violations. They also allege that the defendants (3) conspired, in violation of 42 U.S.C. §§ 1985(3) and 1986, and (4) violated the Posse Comitatus Act, 18 U.S.C. § 1385.[5] The Court will address each of these claims in turn.

#### 1. *Bivens Claims*

The plaintiffs bring monetary damages claims under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), against several named defendants in

---

[5] Only the *Buchanan* plaintiffs bring claims under the Posse Comitatus Act. *See* FAC at 47 ("Fifth Cause of Action: Ultra Vires Conduct in Violation of the Posse Comitatus Act).

their personal capacities, seeking damages for alleged violations of their First, Fourth, and Fifth

Amendment rights.[6]  The government moves to dismiss the *Bivens* claims against defendants

Barr, Monahan, Fennelly, Adamchik, and Seiberling for failure to state a claim.  Alternatively,

the government argues that these defendants are entitled to qualified immunity.  The Court

agrees that the *Bivens* claims must be dismissed because an extension of the *Bivens* remedy to

this "new context" is unwarranted.  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1859 (2017).

    The Supreme Court has set forth a two-step inquiry which governs whether an extension

of *Bivens* is appropriate.  First, a court must "inquire whether the request involves a claim that

arises in a new context or involves a new category of defendants."  *Hernandez v. Mesa*, 140 S.

Ct. 735, 743 (2020) (internal quotation marks omitted).  The Supreme Court's "understanding of

a new context is broad."  *Id.* (internal quotation marks omitted).  The test is whether "the case is

different in a meaningful way from previous *Bivens* cases" decided by the Supreme Court.

*Abbasi*, 137 S. Ct. at 1859.  The Supreme Court "has made clear that expanding the *Bivens*

remedy is now a disfavored judicial activity."  *Abbasi*, 137 S. Ct. at 1857 (internal quotation

marks omitted).

    Next, if a *Bivens* case involves a new context, a court must "ask whether there are any

special factors that counsel hesitation about granting the extension."  *Hernandez*, 140 S. Ct. at

743 (alterations and internal quotation marks omitted).  At this second stage, the *Bivens* claim

must be rejected if there is "reason to pause before applying *Bivens*" in the new context.  *Id.*

"Central to this analysis are separation-of-powers principles."  *Id.* (alteration and internal

quotation marks omitted).  A court must "consider the risk of interfering with the authority of the

---

[6] Only the *Buchanan* plaintiffs bring damages claims for violations of their Fifth Amendment
rights.  *See* FAC at 45 (Third Cause of Action: Violation of the Fifth Amendment).

other branches, . . . ask whether there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy, and whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* (citations and internal quotation marks omitted).

Twice in the last four years, the Supreme Court has addressed the proper approach to inferring causes of action for damages under the Constitution. *See Hernandez*, 140 S. Ct. 735 (2020); *Abbasi*, 137 S. Ct. 1843 (2017). According to the Court, *Bivens* and its progeny "were the products of an era when the Court routinely inferred causes of action that were not explicit in the text of the provision that was allegedly violated." *Hernandez*, 140 S. Ct. at 741 (internal quotation marks omitted). The Court has criticized this "*ancien regime*," noting that "[i]n later years, we came to appreciate more fully the tension between this practice and the Constitution's separation of legislative and judicial power." *Id.* Accordingly, "for almost 40 years," the Court has "consistently rebuffed requests to add to the claims allowed under *Bivens*." *Id.* at 743. The *Bivens* claims in these cases—brought under the First, Fourth, and Fifth Amendments—all arise in a new context.

The plaintiffs' First Amendment claim arises in a new context because the Supreme Court has never extended *Bivens* to a claim brought under the First Amendment. *See id.* at 741 (noting that the Court has recognized *Bivens* claims in the Fourth, Fifth, and Eighth Amendment contexts); *see also Bush v. Lucas*, 462 U.S. 367 (1983) (declining to extend *Bivens* to a claim sounding in the First Amendment). Even so, the plaintiffs argue that the context is not new because decades-old D.C. Circuit precedent recognized a *Bivens* claim for First Amendment violations of protesters' rights. *See Dellums v. Powell*, 566 F.2d 167, 194 (D.C. Cir. 1977). But, as both Supreme Court and D.C. Circuit precedent instruct, it is only Supreme Court decisions

that count when determining whether a *Bivens* claim arises in a new context. *See Abbasi*, 137 S. Ct. at 1859 ("If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new."); *Loumiet v. United States*, 948 F.3d 376, 382 (D.C. Cir. 2020) (noting that "the new-context analysis may consider only Supreme Court decisions approving *Bivens* actions").

The plaintiffs' Fourth and Fifth Amendment claims likewise arise in a new context. In *Bivens* itself, the Supreme Court created an implied damages remedy under the Fourth Amendment for an allegedly unconstitutional search and arrest carried out in a New York City apartment, *see* 403 U.S. at 389, and in *Davis v. Passman*, the Court allowed damages under the Fifth Amendment for alleged sex-based employment discrimination on Capitol Hill, *see* 442 U.S. 228, 230–31 (1979). But, critically, "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Hernandez*, 140 S. Ct. at 743. In *Hernandez*, for example, the plaintiffs argued that their Fourth and Fifth Amendment claims did not involve a new context because *Bivens* and *Davis* had already recognized claims under those same two amendments. *Id.* The Supreme Court rejected this argument, finding it "glaringly obvious" that plaintiffs' claims presented a new context. *Id.* It stressed the "world of difference" between a cross-border shooting incident and an arrest and search in a New York City apartment or sex-based discrimination on Capitol Hill. *Id.* at 744.

As in *Hernandez*, "once we look beyond the constitutional provisions invoked in *Bivens*, *Davis*, and the present case, it is glaringly obvious that [the plaintiffs'] claims involve a new context, *i.e.*, one that is meaningfully different." *Id.* at 743. The claims at issue here concern government officers' response to a large protest in Lafayette Square outside the White House,

which is markedly different from entering and searching a private apartment to enforce federal narcotics laws.  The context in which these claims arise is also "meaningfully different" from the context of sex-based employment discrimination at issue in *Davis*.  *Id.*  The plaintiffs attempt to overcome this problem by downplaying the significance of *Hernandez*, arguing that whereas *Hernandez* was about "border security or national security," Pl.'s Opp'n at 27, Dkt. 51 (No. 1542), these cases are about "*protester* security," *id.*  But, as the Supreme Court has instructed, what matters is whether the claims in this case arise in a similar context to *Bivens* or *Davis*, *see Hernandez*, 140 S. Ct. at 743, and the claims here clearly do not.

Next, the Court considers whether any special factors counsel hesitation before extending an implied constitutional damages remedy to the new context presented by these cases.  *Id.* at 743.  The Supreme Court has "not attempted to create an exhaustive list of factors that may provide a reason not to extend *Bivens*," *id.*, but has explained that "central to this analysis are separation-of-powers principles," *id.* (alteration and internal quotation marks omitted).

In this case, several special factors counsel hesitation.  First, national security—specifically, the country's national-security interest in the safety and security of the President and the area surrounding the White House—strongly weighs against creating a *Bivens* remedy here.  Though "national-security concerns must not become a talisman used to ward off inconvenient claims—a label used to cover a multitude of sins," *Abbasi*, 137 S. Ct. at 1862 (internal quotation marks omitted), the Supreme Court has repeatedly recognized that national security concerns are a weighty special factor in the *Bivens* analysis.  *See Hernandez*, 140 S. Ct. at 745–46; *Abbasi*, 137 S. Ct. at 1861.  And the Court has also acknowledged the importance to national security of presidential security and safety.  *See Watts v. United States*, 394 U.S. 705, 707 (1969) (per

12

curiam) (noting the nation's "overwhelming[] interest in protecting the safety of its Chief Executive"); *accord Wood v. Moss*, 572 U.S. 744, 758–59 (2014).

In this context, it matters not whether the national security risk actually justified the particular action taken. *See Hernandez*, 140 S. Ct. at 746. "The question is not whether national security requires such conduct. . . .". *Id.* Rather, the question is whether "national-security concerns" were present in the decision-making process the federal officials faced and thus "whether the Judiciary should alter the framework established by the political branches for addressing [similar] cases." *Id.* When it comes to managing crowd activity directly outside of the White House,[7] decisionmakers must weigh public, presidential, and White House security interests. "Just as the White House area is a unique situs for first amendment activity, it is also a unique situs for considerations of presidential and national security." *White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1533 (D.C. Cir. 1984) (internal quotation marks and footnotes omitted). "For a structure of such obvious significance to presidential and national security, the White House is singularly exposed to potential terrorist attack." *Id.* "In short, the need for effective security in the vicinity of the White House is great, but the geographical position of the Mansion renders it inherently insecure." *Id.* And when it comes to presidential security specifically, the presence of a large crowd of protesters, even a peaceful one, near the president

---

[7] As noted, the Black Lives Matter plaintiffs allege that the defendants' "professed purpose" for forcibly clearing Lafayette Square was "to clear the area to permit the President to walk to a photo opportunity at a nearby church." TAC ¶ 2. But in their pleadings and during the hearing on these motions, the plaintiffs highlighted the defendants' varying justifications for the park clearing. *See* FAC ¶¶ 89–95; Hrg. Tr. at __. They contend that these shifting explanations suggest that there was no legitimate justification for the defendants' actions. *Id.* Regardless whether the park was cleared to protect the President, to expand the perimeter of the White House, or to enforce the curfew or prevent further violence by demonstrators near the White House, all of these possible justifications raise national security issues that counsel hesitation in extending a *Bivens* remedy here. *See id.*

implicates presidential security questions.  *See Wood*, 572 U.S. at 762–63 (finding that presidential security was implicated when 200 to 300 protesters congregated within weapons range of the President).

The fact that the plaintiffs challenge "the direct and substantial involvement of . . . *individuals*," Pl.'s Opp'n at 29–30, Dkt. 51 (No. 1542), rather than "high-level, government-wide national defense policies," *id.*, does not mean that national security concerns did not exist.  The Supreme Court's most recent *Bivens* case involved a challenge to one instance of a single line officer's conduct, *see Hernandez*, 140 S. Ct. at 740, yet the Supreme Court still found that national security was a special factor counseling against extension of the *Bivens* remedy, *see id.* at 745–46.  The national security considerations implicated in this context counsel against extending a damages remedy without congressional approval.  *See id.*

Relatedly, a second special factor that weighs against creating a *Bivens* remedy here is Congress' activity in the field governing the relationship between White House and presidential security and protesters' rights.  *Cf. Chappell v. Wallace*, 462 U.S. 296, 304 (1983) (finding that "Congress' activity in the field" was a special factor making it inappropriate to extend *Bivens*).  Tragically, four U.S. Presidents were assassinated in the 100-year period following the Civil War, including three—Presidents Lincoln, Garfield, and McKinley—between 1865 and 1901.  Alarmed by this recurring national tragedy, Congress began in the twentieth century to undertake an escalating series of measures to protect the President, including appropriating funds for the President's protection, *see* 34 Stat. 708 (1906), and making it a federal crime to threaten the President, *see* 39 Stat. 919 (1917) (codified at 18 U.S.C. § 871).  The House Select Committee on Assassinations also released a 600-page report in 1979, *see* H.R. Rep. No. 95-1828, pt. 2 (1979), which proposed various reforms aimed at ensuring presidential safety and security.

14

Congress has acknowledged the potential for conflict between the demands of presidential security and protesters' freedoms.  For example, the House Select Committee on Assassinations wrote that that "[t]he committee was acutely aware of the problem of insuring that civil liberties are preserved, while affording adequate protection to the institutions of democratic society and to public figures."  *Id.* at 464.  The committee was also "mindful of the need to weigh the costs that could accrue to individual privacy, group protest, legitimate dissent, political competition and social change against the benefits of stronger protective measures."  *Id.*  Despite these concerns, a damages remedy for federal officers' violations of protesters' rights was not among the reforms that the committee recommended or that Congress adopted.

Further, Congress has remained attentive to White House security over the last several decades.  For example, in 2014, Congress held oversight hearings regarding a series of security breaches at the White House, including one by an armed fence-jumper who made it inside the White House before being detained.  *See, e.g.*, *White House Perimeter Breach: New Concerns About the Secret Service: Hearing Before the H. Comm. on Oversight and Gov't Reform*, 113th Cong. (2014).

These examples illustrate that Congress has repeatedly considered the trade-offs between White House and presidential security and protesters' freedoms.  Because of Congress' extensive activity in the field, "Congress' failure to provide a damages remedy might be more than mere oversight, and that congressional silence might be more than inadvertent."  *Abbasi*, 137 S. Ct. at 1862 (internal quotation marks omitted).  And given the many years Congress has had "to extend the kind of remedies" sought by the plaintiffs, its silence is both "relevant" and "telling."  *Id.* (alteration and internal quotation marks omitted).  Congress' activity in the field thus constitutes

another special factor which makes it inappropriate to recognize a *Bivens* remedy in the new

context presented by these cases.

And finally, a third special factor counseling hesitation is the availability of alternative

remedies.  "[I]f there is an alternative remedial structure present in a certain case, that alone may

limit the power of the Judiciary to infer a new *Bivens* cause of action."  *Id.* at 1858; *see id.*

(collecting cases).  "[T]he Supreme Court has declined to extend *Bivens* . . . where other causes

of action provide redress."  *Liff v. Off. of Inspector Gen. for U.S. Dep't of Labor*, 881 F.3d 912,

918 (D.C. Cir. 2018).  Here, the plaintiffs seek alternative equitable relief in the form of a

permanent injunction, *see* TAC ¶ 291 (Relief Requested); FAC at 51 (Prayer for Relief), and the

Supreme Court in *Abbasi* specifically recognized "an injunction" and "some other form of

equitable relief" as adequate alternative remedies, 137 S. Ct. at 1865.  Though these alternative

avenues may ultimately prove unsuccessful, that is irrelevant "[s]o long as the plaintiff[s] had an

avenue for some redress."  *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 69 (2001).  Indeed, the

Supreme Court has "rejected the claim that a *Bivens* remedy should be implied simply for want

of any other means for challenging a constitutional deprivation in federal court."  *Id.* (citing

*Schweiker v. Chilicky*, 487 U.S. 412, 421–23 (1988)).

In conclusion, these special factors make it inappropriate to extend *Bivens* into the new

context presented by these cases.  The Court will grant the defendants' motions to dismiss the

*Bivens* claims.

### 2.  *Injunctive Relief*

The plaintiffs seek an injunction under the First, Fourth, and Fifth Amendments against

the federal official-capacity defendants' alleged practices of "deploying physical force against

demonstrators to remove them from places in which they have gathered with others to express

their political opinions," TAC ¶ 232, and "deploying physical force without provocation, warning, or legal grounds to do so, against demonstrators to force them to halt or move," *id.* ¶ 237.[8]  Some of the plaintiffs also seek an injunction under the First Amendment against alleged restrictions on demonstrators' access to Lafayette Square.  *See* FAC ¶¶ 119, 51 (Prayer for Relief).

                i.       Threatened Dispersal of and Use of Force Against Demonstrators

       Before addressing the merits of this claim, the Court must apprise itself of subject-matter jurisdiction, including the plaintiffs' standing to sue.  To establish standing, a plaintiff must show: (1) an "injury in fact"; (2) a "causal connection between the injury" and the challenged action; and (3) a likelihood that the "injury will be redressed by a favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted).  When plaintiffs seek injunctive relief, as they do here, "past injuries alone are insufficient to establish standing."  *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011).  Instead, "[a]n allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted).  Of note, "allegations of *possible* future injury are not

---

[8] To the extent the plaintiffs attempt to sue the United States or any official capacity defendants for money damages, *see, e.g.*, TAC ¶ 292 (not limiting the request for damages to individual capacity defendants); *see also Black Lives Matter*, Official Capacity Defs.' Mot. to Dismiss at 9 n.3, Dkt. 35-1 ("Plaintiffs have sued the United States in addition to federal officials in their individual capacities."), such an attempt is improper.  "Federal constitutional claims for damages are cognizable only under *Bivens*, which runs against individual government officials personally."  *Loumiet*, 828 F.3d at 945 (citing *FDIC v. Meyer*, 510 U.S. 471, 482, 485–86 (1994)).  And "sovereign immunity shields the Federal Government and its agencies from suit."  *Debrew v. Atwood*, 792 F.3d 118, 124 (D.C. Cir. 2015) (internal quotation marks omitted).  Without any showing that the United States has waived sovereign immunity for money damages in this context, the plaintiffs may not seek money damages against the United States or the defendants sued in their official capacity.

sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks omitted) (emphasis in original).  Future injuries—even those with an "objectively reasonable likelihood" of occurring—are not adequate to establish standing.  *Id.*  The plaintiffs have not adequately pleaded either an ongoing injury or an immediate threat of future injury based on the defendants' June 1 clearing of Lafayette Square.  Because the plaintiffs lack standing, the Court lacks jurisdiction to issue an injunction ordering the defendants to change their practices of using physical force against protestors.

In an effort to establish ongoing injury, the plaintiffs allege ongoing chilling effects resulting from the events of June 1, 2020.  *See, e.g.*, FAC ¶ 78 (returning to Lafayette Square to protest has caused panic attacks); Pl.'s Opp'n at 84, Dkt. 51 (No. 1542) (plaintiffs "look over their shoulders while they engage in protest activity").  But such allegations of a subjective chilling effect resulting from the defendants' past actions are insufficient to confer standing. *Compare Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("[A]llegations of a subjective 'chill' [upon the exercise of First Amendment rights] are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."); *with Clark v. Libr. of Cong.*, 750 F.2d 89, 93 (D.C. Cir. 1984) (ongoing harm shown where plaintiff alleged "a targeted investigation of an individual based solely on the exercise of his associational rights resulting in concrete harms to his reputation and employment opportunities").

The plaintiffs similarly fail to establish standing based on an immediate threat of future harm.  In *Los Angeles v. Lyons*, the Supreme Court held that a plaintiff who alleges past harm lacks standing to seek injunctive relief if there is no real and immediate threat the harm will occur again.  *See* 461 U.S. 95, 105 (1983).  The plaintiffs allege that they continue to demonstrate in or near Lafayette Square and that they fear law enforcement officers may disperse

or attack them.  *E.g.*, FAC ¶ 73 ("Ms. Buchanan worries that at any moment, law enforcement may decide that they do not want the protesters there and use violence to get rid of them.").  The plaintiffs' primary basis for these fears are the alleged events of June 1, 2020 and President Trump's social media posts before and after the clearing of Lafayette Square.  *See, e.g.*, TAC ¶¶ 53–64; FAC ¶¶ 47–49, 64.  Significantly, the plaintiffs do not rely on any alleged law or policy as the basis for this claimed risk of future harm.  Indeed, "Plaintiffs do not challenge a large-scale policy—or any policy at all.  Rather, Plaintiffs challenge . . . the implied threat to take similar actions in the future at the President's whim."  Pls.' Opp'n at 51, Dkt. 98 (No. 1469); *accord* Pl.'s Opp'n at 36, Dkt. 51 (No. 1542) ("Nor does the FAC identify even a single policy to challenge.").

Because the plaintiffs do not claim that a law or policy has "ordered or authorized police officer to act in such manner" as allegedly occurred on June 1, *Lyons*, 461 U.S. at 106, the plaintiffs' claims of impending future harm are too speculative to confer standing to seek an injunction, *cf. id.* at 105–06 (noting the speculative chain of events that must be hypothesized "[i]n order to establish an actual controversy in this case").  Such harm would require that plaintiffs again demonstrate in Lafayette Square; that agencies headed by the official-capacity defendants again respond to the demonstration; that federal officers again use that law enforcement response as cover to deliberately target non-violent peaceful demonstrators; and that one or more of the plaintiffs again be targeted.  This hypothetical chain of events is simply too speculative to confer standing for injunctive relief.

Black Lives Matter also fails to demonstrate standing as an organizational plaintiff.  There are two forms of organizational standing—representative standing and direct standing.  As to representative standing, "[a]n association has standing to bring suit on behalf of its members

when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).  Black Lives Matter lacks representative standing because, as discussed above, no individual plaintiff has standing to sue for injunctive relief in their own right.

To have direct organizational standing, "the organization's pleadings must survive the same standing analysis as that applied to individuals." *Am. Legal Found. v. FCC*, 808 F.2d 84, 89 (D.C. Cir. 1987).  To that end, Black Lives Matter alleges that it has changed its activities in numerous ways in response to the events of June 1, 2020.  For example, it has "divert[ed] resources to assessing and planning for potential violence by police," TAC ¶ 126, "enhance[d] efforts to educate members and supporters regarding the potential dangers of police violence," *id.*, and "engage[d] in a communications campaign about the events in Lafayette Square," *id.* This has allegedly "reduced its capacity to plan events and programming consistent with its mission." *Id.* ¶ 127.  Moreover, Black Lives Matter alleges that it carries out its mission through "protests [and] public accountability campaigns," among other tactics, *id.* ¶ 117, and the events of June 1st decreased participation in its protests because "[p]eople who ordinarily attend in-person protests . . . are afraid to do so because of the violence that occurred at Lafayette Square," *id.* ¶ 125.

Black Lives Matter's direct standing allegations suffer from the same infirmity as those of the individual plaintiffs—it cannot show the "continuing violation or the imminence of a future violation" that is necessary for standing to pursue injunctive relief. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998).  All of the organization's standing-related

allegations concern how it and its members were affected by the events of June 1, 2020.  Black

Lives Matter no doubt alleges that the events of June 1 have caused continuing harmful *effects* to

it and its members.  *E.g.*, TAC ¶ 125.  But it is "a likelihood of future *violations* of [Black Lives

Matter's] rights . . . not simply future *effects* from past violations" which must be alleged to

establish standing.  *Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d

1268, 1273 (D.C. Cir. 1994) (emphasis in original).  Like the individual plaintiffs, Black Lives

Matter does not show that the official-capacity defendants are likely to again perpetrate the

claimed constitutional violations of June 1, 2020.  Because each of the plaintiffs lack standing to

seek an injunction against the official-capacity defendants' threatened dispersal of—and use of

force against—demonstrators in Lafayette Square, the Court lacks jurisdiction over these claims.

ii.     Restricted Access to Lafayette Square

Some of the plaintiffs also seek an injunction against restricted access to Lafayette

Square.  These plaintiffs allege that Lafayette Square is a traditional public forum and that the

defendants' "decision to erect a fence around Lafayette Park . . . infringed upon Plaintiffs' rights

to assemble, protest, and demonstrate peaceably by blocking all available access points to the

park."  FAC ¶ 119.  The Court finds that the plaintiffs have standing to challenge the alleged

restrictions on demonstrators' access to Lafayette Square.

"[G]rant[ing] plaintiffs the benefit of all inferences that can be derived from the facts

alleged," *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012)

(alterations and internal quotation marks omitted), the complaint plainly challenges ongoing

restrictions on access to Lafayette Square that have allegedly resulted from the defendants'

decision to build a fence around Lafayette Square and restrict access to it.  *See* FAC ¶¶ 119, 122.

Unlike with their allegations concerning the alleged threats to disperse and use force against

demonstrators, the plaintiffs here do not allege a one-time event, but rather that defendants constructed structures which *continue* to either limit or categorically prohibit access to Lafayette Square.

The government invokes a public notice from the National Park Service stating that "absent a law enforcement need to close the White House Complex, the restrictions will not limit the public's ability to demonstrate in the remainder of the park."  Def's Reply at 8–9, Dkt. 58 (No. 1542) (alteration and internal quotation marks omitted).  But standing is assessed "at the time the action commences," *Laidlaw*, 528 U.S. at 170, so the defendants' subsequent actions and current policy with respect to Lafayette Square do not negate the plaintiffs' standing.

To the extent the defendants contend that the plaintiffs' challenge to restricted access to Lafayette Square is now moot, *see* Def.'s Mot. to Dismiss at 8, Dkt. 35-1 (No. 1542) ("In any event, although Lafayette Park was temporarily closed on June 1st, the National Parks Service has since reopened the Park to the public with some modifications"), this assertion also fails. The defendants have not met the "stringent" requirement of showing that the challenged conduct—here, restricting demonstrators' access to Lafayette Square—cannot reasonably be expected to start up again.  *Laidlaw*, 528 U.S. at 189 (describing the standard as "stringent" and a "heavy burden").  This is especially so given the repeated closures and modifications to Lafayette Square since this litigation began.  *See* Hearing Tr. at __.

Finally, the defendants make several arguments which appear to address the merits of the plaintiffs' First Amendment challenge.  For example, they stress that "[t]he gates are only closed when law enforcement determines they need to close the Square for security or law enforcement reasons."  Def.'s Reply at 9, Dkt. 58 (No. 1542).  And they also argue that none of the permanent or semi-permanent "modifications" to the Square "prohibits demonstrations generally."  *Id.*  But

the federal defendants did not move to dismiss the plaintiffs' request for a First Amendment injunction on the merits under Rule 12(b)(6), and these arguments do not negate the plaintiffs' standing to seek an injunction based on plausibly alleged ongoing restrictions on their First Amendment rights to demonstrate in Lafayette Square.  The plaintiffs have standing to seek an injunction against alleged restrictions on their access to Lafayette Square.

3.     *Section 1985(3) and 1986 Claims*

The plaintiffs in *Black Lives Matter* seek damages against the individual-capacity defendants and an injunction against the official-capacity defendants under 42 U.S.C. §§ 1985(3) and 1986.[9]  They argue that defendants Trump, Barr, and Esper directed a conspiracy which "targeted Black people and their supporters" for illegal uses of violent force.  TAC ¶ 245 (No. 1469).  Section 1985(3) provides:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3) (2018).  Section 1986 also imposes civil liability on "[e]very person who, having knowledge [of a § 1985 conspiracy], and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so."  *Id.* § 1986.

---

[9] After the defendants argued that sovereign immunity bars damages against the official-capacity defendants, *see* Off. Capacity Mot. to Dismiss at 23, Dkt. 79-1 (No. 1469), the plaintiffs clarified that they "do not seek damages from the official-capacity Defendants."  Pls.' Opp'n at 89, Dkt. 98 (No. 1469) (citing TAC ¶¶ 253, 261).

The plaintiffs' have failed to adequately plead the first two essential elements of a § 1985(3) conspiracy.[10]  Accordingly, the defendants are entitled to qualified immunity as the plaintiffs have not plausibly alleged a violation of law.  To state a claim under § 1985(3), a plaintiff must plead four elements: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Hobson v. Wilson*, 737 F.2d 1, 14 (D.C. Cir. 1984). Moreover, a plaintiff must adequately plead a § 1985(3) claim to maintain a § 1986 claim: "A plaintiff who has not stated a claim under § 1985 has no basis for relief under § 1986." *Moore v. Castro,* 192 F. Supp. 3d 18, 36 (D.D.C. 2016), *aff'd sub nom. Moore v. Carson,* 775 F. App'x 2 (D.C. Cir. 2019).

The plaintiffs do not argue that the defendants entered into an explicit agreement, but "courts have to infer an agreement from indirect evidence in most civil conspiracy cases." *Halberstam v. Welch*, 705 F.2d 472, 486 (D.C. Cir. 1983).  The question is whether the plaintiffs' complaint contains sufficient non-conclusory allegations, *see Iqbal*, 556 U.S. at 678, to justify an inference that the defendants reached an agreement to target Black people and their supporters for the illegal use of violent force.

The non-conclusory allegations on which the plaintiffs contend an agreement can be inferred include the following: before Lafayette Square was cleared, President Trump's Twitter posts "threatened to use and encouraged violence against protesters," TAC ¶ 5; President Trump

---

[10] Because the Court resolves these claims on this ground, it need not resolve the parties' disputes about whether an equitable remedy is available or whether the defendants are entitled to intracorporate immunity.

directed Barr to "personally lead the response to the unrest," *id.* ¶ 60; Barr requested "'riot teams' and other specialized agents" from other federal agencies, *id.*; on June 1, law enforcement officers met at the Joint Operations Command Center at Lafayette Square, *id.* ¶ 45; before the Square was cleared, Barr was seen meeting with federal law enforcement personnel and "pointing north towards St. John's Church," *id.* ¶ 79; federal, D.C., and Arlington officers used the same type of force to disperse demonstrators, *e.g.*, *id.* ¶¶ 141–43, 190–91; and Barr and Esper walked with the President to St. John's Church after the Square was cleared, *id.* ¶ 203.[11]

These allegations, taken as true, do not show sufficient "events, conversations, or documents indicating an agreement or meeting of the minds' amongst the defendants to violate [plaintiffs'] rights based on [their] membership in a protected class." *Barber v. D.C. Gov't*, 394 F. Supp. 3d 49, 66 (D.D.C. 2019) (alteration and internal quotation marks omitted). Rather, they demonstrate only that these officials were communicating with each other on June 1, prior to and after the clearing of Lafayette Square. Merely alleging that the defendant officials communicated, without alleging any details of those communications that suggest an unlawful agreement, cannot justify inferring the requisite agreement for a § 1985(3) conspiracy. *Cf. Abbasi*, 137 S. Ct. at 1868 (suggesting, but not deciding, that "officials employed by the same governmental department do not conspire when they speak to one another and work together in their official capacities").

The plaintiffs argue otherwise, primarily by appealing to two cases involving radically different factual circumstances. First, in *Lagayan v. Odeh*, this Court considered common law

---

[11] Throughout their complaints, the plaintiffs also frequently assert that the defendants "coordinated" with each other or acted according to a "concerted plan." *E.g.*, TAC ¶¶ 45, 76, 99, 107. But these allegations, which "are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

conspiracy and § 1985 claims arising from an alleged conspiracy to traffic the plaintiff to the
United States and enslave her.  199 F. Supp. 3d 21, 24–26, 30–32 (D.D.C. 2016).  The Court
found that the requisite agreement could be inferred because the defendants—all of whom were
related to each other—together coordinated the plaintiff's international travel to the defendants'
home in the United States.  *Id.* at 31.  Thus, the plaintiff was not required to allege "an event,
conversation, or document showing that there was an agreement among the alleged
conspirators."  *Id*. at 30 (internal quotation marks omitted).  Second, in *United States v. Scott*, the
Second Circuit considered a conspiracy claim arising from prison officers' group beating of an
inmate.  979 F.3d 986, 988–89 (2d Cir. 2020).  There, because the officers worked together to
keep the inmate restrained, restrict his ability to protect himself, and remove potential witnesses,
the evidence supported a finding of agreement despite the lack of "an extended period of
premeditation or a distinct verbal agreement."  *Id.* at 990–91.  Neither of these cases support
finding an agreement here.

The D.C. Circuit has instructed that "[t]he circumstances of the wrongdoing generally
dictate what evidence is relevant or available in deciding whether an agreement exists."
*Halberstam*, 705 F.2d at 486.  Here, the management of possible violence, enforcement of the
impending curfew, and policing of demonstrators in Lafayette Square in advance of the
President's travel across the Square generate "obvious alternative explanation[s]," *Iqbal*, 556
U.S. at 682 (internal quotation marks omitted), for the defendants' communications and activities
other than having formed an agreement to violate the plaintiffs' civil rights.  *See* FAC ¶¶ 89–95.
In the circumstances of this case, then, the plaintiffs' allegations concerning the defendants'
proximity to each other and parallel activities alone cannot justify inferring "an agreement or
meeting of the minds amongst the defendants to violate [the plaintiffs'] rights based on [their]

membership in a protected class."  *Barber*, 394 F. Supp. 3d at 66 (internal quotation marks omitted).

For these reasons, the conspiracy claims will be dismissed.

4.        *Posse Comitatus Act (PCA)*

The *Buchanan* plaintiffs allege that the defendants deployed military police and National Guard members to Lafayette Square on June 1, 2020, in violation of the Posse Comitatus Act (PCA), 18 U.S.C. § 1385.  *See* FAC ¶¶ 143–51.  They seek damages for the defendants' alleged violation of the PCA, or, in the alternative, to maintain an *ultra vires* claim for declaratory and injunctive relief.  The Court will dismiss both claims.

i.        PCA Damages Claim

Critically, the PCA does not create a private civil cause of action for damages.  The PCA provides that "[w]hoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both."  18 U.S.C. § 1385.  Criminal statutes like the PCA do not always—or even generally—create a cause of action for civil damages.  *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994) (concluding that finding a "concomitant civil damages cause of action" with every criminal statute "would work a significant shift in settled interpretive principles regarding implied causes of action"); *Sai v. Trump*, 325 F. Supp. 3d 68, 71 (D.D.C. 2018) ("[C]ourts are quite reluctant to infer a private right of action from a criminal prohibition alone.") (internal quotation marks omitted).  Because Congress enacted the PCA as a criminal statute, the Court must find independent evidence of Congress' intent to create a civil damages remedy before allowing such an action to proceed.

*See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.").

That evidence is lacking here.  There is no indication from the text of the PCA that Congress intended to create a private civil right of action.  Instead, the text creates a criminal penalty with no mention whatsoever of any civil remedy.  *See* 18 U.S.C. § 1385 (violators "shall be fined under this title or imprisoned not more than two years, or both").  The plaintiffs attempt to overcome the plain text of the statute by citing extra-textual sources sounding in statutory purpose.  In particular, they argue that the PCA was motivated by a long-standing "[s]trong opposition to military encroachment into civilian life" in this country.  Pl.'s Opp'n at 73, Dkt. 51 (No. 1542).  But the fact that Congress disfavored military encroachment into civilian life does not indicate that it intended to include a civil remedy in a statute which by its terms creates only criminal penalties.  The plaintiffs provide no probative evidence regarding the enacting Congress' view of the scope or operation of the PCA, so there is no justification for finding that Congress intended the statute to include an extra-textual civil remedy.

These reasons weigh heavily against recognizing an implied cause of action for damages under the PCA, and numerous courts have found that the PCA does not create a private civil cause of action.  *E.g.*, *Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002); *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 511 (2d Cir. 1994).  The Court finds no reason to depart from the weight of the authority and will dismiss the plaintiffs' claim for damages under the PCA.

ii.     *Ultra Vires* Claim

The D.C. Circuit has described *ultra vires* review as "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). *Ultra vires* review is only available "when the agency's error is patently a misconstruction of the Act, or when the agency has disregarded a specific and unambiguous statutory directive, or when the agency has violated some specific command of a statute. Garden-variety errors of law or fact are not enough." *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988) (citations and internal quotation marks omitted).

The plaintiffs have failed to state a viable *ultra vires* claim for the defendants' alleged violation of the PCA, which prohibits "willfully us[ing] any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws." 18 U.S.C. § 1385. The plaintiffs allege that D.C. National Guard personnel participated in the clearing of Lafayette Square on June 1, 2020. However, the issue of the PCA's application to National Guard units which have not been ordered to active duty is less than "specific and unambiguous," *Griffith*, 842 F.2d at 493. As the Seventh Circuit recently explained:

> The Posse Comitatus Act . . . only bars the Army and Air Force from domestic law enforcement, but does not apply to Title 32 National Guard duty. 18 U.S.C. § 1385 . . . . While the Army National Guard and the Air National Guard are reserve components of the Army and Air Force, respectively, the National Guards are covered by different statutes (*i.e.*, Title 32) than those that apply to the active duty forces (*i.e.*, Title 10).

*Mueller v. City of Joliet*, 943 F.3d 834, 837 (7th Cir. 2019). Consistent with the Seventh Circuit's analysis, the defendants argue that the PCA only applies to members of the D.C. National Guard when they have been ordered to active duty pursuant to Title 10 of the U.S. Code. And the plaintiffs here have not alleged that on June 1 the D.C. National Guard members had been ordered to active duty under Title 10. The plaintiffs respond that "in light of its unique

role among National Guard units as a federal entity, the D.C. National Guard should be considered perpetually in federal service, such that the Posse Comitatus Act would apply to it at all times."  Pl.'s Opp'n at 71, Dkt. 51 (No. 1542) (internal quotation marks omitted).  But the plaintiffs cite neither binding nor on-point persuasive authority supporting this novel theory.  Accordingly, the Court will dismiss the plaintiffs' *ultra vires* claim.

### B.    D.C. and Arlington Defendants

The plaintiffs bring claims against the D.C. and Arlington individual officers under 28 U.S.C. § 1983 for violations of their First, Fourth, and Fifth Amendment rights, under §§ 1985(3) and 1986 for conspiracy, and against the D.C. and Arlington County municipal governments under § 1983.  The individual defendants argue that they are entitled to qualified immunity, while the municipalities argue that the plaintiffs have failed to state a claim.

### 1.    *Venue*

Before proceeding to the merits of the claims against the D.C. and Arlington defendants, the Court will consider whether venue is proper in the District of Columbia as to the Arlington defendants.  Venue is "generally governed by 28 U.S.C. § 1391," *Atl. Marine Const. Co. v. U.S. Dist. Court for Western Dist. of Tex.*, 571 U.S. 49, 55 (2013), which states that "[e]xcept as otherwise provided by law . . . [t]his section shall govern the venue of all civil actions brought in district courts in the United States," 28 U.S.C. § 1391(a)(1).  Section 1391 provides that: "[a] civil action may be brought in . . . a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."  *Id*. § 1391(b)(2).  None of the parties dispute that the events giving rise to the plaintiffs' claims occurred in the District of Columbia, in or around Lafayette Square.  *See, e.g.*, FAC ¶¶ 3–4.  Thus, under the general rule of venue, this district

constitutes the "judicial district in which a substantial part of the events . . . giving rise to the claim occurred," 28 U.S.C. § 1391(b)(2), and venue here is proper.

But the Arlington defendants (officers Vincent, Allen, and Black) argue that venue in this district is improper because a compact between the Park Police and the Arlington Police implies venue in Virginia.  Def.'s Reply at 2–6, Dkt. 57 (No. 1542).  They base this argument on Section 7302 of the Intelligence Reform and Terrorism Prevention Act of 2004, which includes a provision on National Capital Region Mutual Aid ("NCRMA").  *See* 42 U.S.C. § 5196 note. That provision establishes the venue rule for mutual aid agreements between federal and state or local governments that meet certain requirements.  It states that "[a]ny action brought against a party or its officers, employees, or agents on account of an act or omission in the rendering of aid [to the receiving party]" under certain mutual aid agreements must be brought "under the laws and procedures of the State of the party rendering aid and only in the Federal or State courts located therein."  *Id.* § 5196 note (d).  The Arlington defendants contend that this provision applies to a 2016 agreement between the U.S. Park Police and the Arlington County Police Department to provide "law enforcement assistance in the event of an emergency of public service events" which was signed by the chiefs of both police departments.  Arlington Defs.' Mot. to Dismiss Ex. D, Dkt. 36-4 (No. 1542) ("Agreement").  Pursuant to the Agreement, the Park Police requested that Arlington Police assist in managing the demonstrations on June 1, 2020.  Law Enforcement Support Request Form, Dkt. 36-5 (No. 1542).

This argument is unavailing.  First, in order to trigger the venue requirement of the NCRMA, an agreement involving the federal government must be executed by an "authorized representative of the Federal Government." 42 U.S.C. § 5196 note (b)(1).  This includes an "individual or individuals designated" for this task "by the President with respect to the

executive branch, the Chief Justice with respect to the Federal judiciary, or the President of the Senate and Speaker of the House of Representatives with respect to Congress, or their designees." *Id.* § 5196 note (a)(1).  Here, there is no indication that the Chief of the U.S. Park Police was so designated by the President.  Even so, the Arlington defendants insist that the agreement is valid because the Park Police Chief acted pursuant to *implied* authority.  *See* Arlington Defs.' Reply at 2, Dkt. 57 (No. 1542).  But that argument holds little water where the statute explicitly requires actual authority.  Here, the statute specifies who may "enter into, request or provide assistance under mutual aid agreements with localities," 42 U.S.C. § 5196 note (b)(1), and it defines a mutual aid agreement as one "authorized under subsection (b)," *id.*

Second, the Agreement itself indicates that it was not meant to incorporate the entirety of the NCRMA.  For example, it describes the parties' respective authority to enter the agreement in other federal, state, and local law, rather than the relevant NCRMA statute.  *See* Agreement at 1 (citing, for example, D.C. Code Ann. § 5-205, Virginia Code § 15.2-1726).  And although the Agreement states that it falls under the NCRMA in one instance, *see id.*, it explicitly limits this reference to situations in which "the USPP is requested by the ACPD to provide [assistance], to which the liability provisions of [NCRMA] shall apply."  *Id.*  Here, by contrast, the Arlington Police were requested by the U.S. Park Police to provide assistance, not the other way around. *See* Law Enforcement Support Request Form, Dkt. 36-5 (No. 1542).  Because all of the events giving rise to this suit occurred in the District of Columbia, *see* 28 U.S.C. § 1391(b)(2), and the mutual aid agreement does not require venue elsewhere, venue in the District of Columbia is proper as to the Arlington defendants.

2.      *Section 1985(3) and 1986 Claims*

The section 1985(3) and 1986 conspiracy claims against the D.C. and Arlington

defendants must be dismissed for the same reason that the parallel conspiracy claims against the

federal defendants were dismissed.  That is because, as described at length above, *supra* III.A.3,

the plaintiffs have not plausibly alleged the existence of a conspiracy.  Thus, it cannot be said

that the D.C. and Arlington officials either participated in, or had the opportunity to prevent, a

conspiracy that itself has not been plausibly alleged.

3.      *Section 1983 Damages Claims—Individual Defendants*

The plaintiffs also bring claims for damages against Arlington and D.C. officials in their

individual capacities under 42 U.S.C. § 1983.  Among other things, they allege that the

defendants violated their First Amendment rights by "suppress[ing] a peaceful demonstration

and the viewpoint it represented," TAC ¶ 264; *see also* FAC ¶¶ 152–58, and violated their Fourth

Amendment rights by "the use of physical force," TAC ¶ 271, including "chemical agents," *id.*,

which caused the plaintiffs "to move from the area around Lafayette Square, without a warrant or

probable cause," *id.*  The *Buchanan* plaintiffs also bring a separate Fifth Amendment claim for

the violation of their rights under substantive due process, although they do not distinguish

between the different categories of defendants, simply using the general term "defendants"

throughout their claims.  FAC at 45–46.

"The doctrine of qualified immunity protects government officials 'from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223,

231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Because qualified

immunity is "immunity from suit," the Supreme Court "repeatedly ha[s] stressed the importance

of resolving immunity questions at the earliest possible stage in litigation." *Pearson*, 555 U.S. at

232 (internal quotation marks omitted). "Clearly established means that, at the time of the

officer's conduct, the law was sufficiently clear that every reasonable official would understand

that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)

(internal quotation marks omitted). "This demanding standard protects all but the plainly

incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted).

i.    The First Amendment

The plaintiffs bring various claims under the First Amendment, arguing that the District

of Columbia and Arlington defendants restricted their protected speech, retaliated against them

on the basis of their speech, and committed viewpoint discrimination. Two of these claims

survive the defendants' motions.

a.   Restriction of Speech

The complaints allege that the plaintiffs were engaged in a peaceful protest when federal

and Arlington defendants "destroy[ed] the peaceable gathering" with unprovoked force. TAC ¶

4. The defendants "fired (or ordered to be fired) tear gas, pepper spray capsules, rubber bullets,

and flash bangs into the crowd and physically charged at the protestors to shatter the peaceful

gathering, forcing demonstrators to flee [Lafayette Square]." *Id.* ¶ 3. The *Buchanan* complaint

alleges that District of Columbia MPD officers helped clear Lafayette Square along with the

Arlington and federal officers, *see* FAC ¶ 57,[12] while the other three complaints do not place

---

[12] The *Buchanan* plaintiffs base this allegation on "information and belief." FAC ¶ 57. The D.C.
defendants urge the Court to disregard the allegation because the facts underlying it were not
"peculiarly within the possession and control of the defendant," and therefore are improper for
pleading on information and belief. D.C. Defs.' Reply at 5, Dkt. 63 (No. f1542) (quoting *Arista
Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)). At this early stage, however, the
Court will accept the facts alleged as true, *Hettinga*, 677 F.3d at 476, acknowledging that the

MPD officers on the Square itself.  The plaintiffs further allege that as "[d]emonstrators [] fled west away from the Square," TAC ¶ 3, they encountered MPD officers who "fired tear gas at demonstrators as they fled."  *Id.*; *see also* FAC ¶¶ 57–58.

Taking these allegations as true, the plaintiffs have alleged an unconstitutional restriction on protected speech.  "Certain types of places are so vital to a healthy and robust public discourse that they are accorded special status under the first amendment. . . . [and] access to them is a small but invaluable part of every American's heritage."  *White House Vigil*, 746 F.2d at 1526.  Lafayette Square, which sits across from the White House, is no doubt one such forum. Indeed, it is a "quintessential public forum," *United States v. Doe*, 968 F.2d 86, 87 (D.C. Cir. 1992), which provides "a unique situs for the exercise of First Amendment rights," *A Quaker Action Grp. v. Morton*, 516 F.2d 717, 725 (D.C. Cir. 1975).

In this traditional public forum, "the government cannot constitutionally prohibit all expressive activities."  *White House Vigil*, 746 F.2d at 1526.  It can only adopt "reasonable time, place and manner restrictions on the exercise of free speech, so long as the restrictions are content-neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels of communication."  *Id.* at 1527 (internal quotation marks omitted). Accepting the facts as alleged in the complaints, the government "prohibit[ed] *all* expressive activities," *id.* at 1526 (emphasis added), in Lafayette Square by violently clearing all of the peaceful protestors, *see* FAC ¶¶ 57–58.  And it did so without *any* basis.  FAC ¶ 10 (the clearing "was undertaken for no rational reason").  Further, no alternative channels of communication

---

plaintiffs have not yet had the benefit of discovery and have alleged that the defendants took specific acts, albeit in concert.  At later stages of the proceedings, the *Buchanan* plaintiffs will need to supplement this allegation with record evidence.

were left open either in the forum itself, or in surrounding areas.  TAC ¶ 109.  Accordingly, the

plaintiffs have plausibly alleged a constitutional violation.

And this violation, as alleged, would have been clear to every reasonable officer at the

time it occurred.  *See Wesby*, 138 S. Ct. at 589.  In *Edwards v. South Carolina*, the Supreme

Court decided a highly analogous case.  372 U.S. 229 (1963).  There, a crowd of about 200

individuals had gathered in front of the state capital in South Carolina to protest racially

discriminatory laws and a crowd of 200 to 300 had gathered to observe the protest.  *Id.* at 230–

31.  As alleged here, the crowd was initially peaceful.  *See id* at 231 ("There was no evidence to

suggest that these onlookers were anything but curious, and no evidence at all of any threatening

remarks, hostile gestures, or offensive language on the part of any member of the crowd.").

Nevertheless, police informed the group that "they would be arrested if they did not disperse

within 15 minutes."  *Id.* at 233.  "After 15 minutes had passed, the police arrested the petitioners

and marched them off to jail."  *Id.*  The Court found a First Amendment violation, reasoning that

"the circumstances in this case reflect an exercise of these basic constitutional rights in their

most pristine and classic form."  *Id.* at 235.  *Edwards* is not perfectly analogous, as there were no

alleged threats of arrest in Lafayette Square on June 1, 2020 (nor, on the other hand, were there

allegations of overwhelming force in *Edwards*), *see generally id.*, yet the precedential weight of

the First Amendment reasoning stands.  In light of this precedent, any reasonable officer would

have been aware that it is a violation of foundational First Amendment rights to forcibly end a

peaceful protest in a traditional public forum without any legitimate justification for doing so.

Of note, the defendants argue that the clearing of the Square was justified by a significant

government interest—the national interest in presidential security, supported by the Supreme

Court's holding in *Wood v. Moss*, 572 U.S. at 747.  There, the Supreme Court considered a First

Amendment challenge against Secret Service officers who moved protestors demonstrating against then-President Bush when the President made an impromptu decision to stop for dinner. *Id.* at 747–48.  The Secret Service declined to move another set of protestors who were across the street demonstrating in favor of the President.  *Id.*  The Court held that the officers were entitled to qualified immunity.  *Id.* at 764.  The Court recognized that, as here, "[f]aced with the President's sudden decision . . . , the Secret Service agents had to cope with a security situation not earlier anticipated."  *Id.* at 748.  As to the question of whether the law was clearly established, the Court was unambiguous—"[n]o decision of this Court so much as hinted that their on-the-spot action was unlawful because they failed to keep the protesters and their supporters, throughout the episode, equidistant from the President."  *Id.*

Although *Wood v. Moss* strongly supports recognizing qualified immunity where protestors' rights intersect with presidential security, the Court is unable at this time to credit the defendants' assertion that the clearing of the Square was done in the interest of presidential security.  After all, the plaintiffs repeatedly allege that the clearing was done for "wholly illegal reason[s]," TAC ¶ 4; *see also* FAC ¶ 8 ("no justification"); *Id.* ¶ 10 ("no rational reason").  True, the *Black Lives Matter* plaintiffs allege that the defendants' "professed purpose" was to "to clear the area to permit the President to walk to a photo opportunity at a nearby church," TAC ¶ 4, but the Buchanan plaintiffs point to a broader range of motives, FAC ¶¶ 89–95; Hrg. Tr. at __.  And all of the plaintiffs argue that the defendants' explanations for the clearing shifted over time. *See, e.g.*, TAC ¶ 4 (describing the President's travel as the *professed* purpose and going on to say it was "wholly illegal"); Hearing Tr. at __ (*Black Lives Matter* plaintiffs pointing out the "shifting justifications").  At this early stage of the proceedings, without any record evidence, the Court cannot assess the defendants' asserted bases for the clearing the Square, nor can it

determine other facts relevant to this claim.  As this case moves forward, both parties will have the opportunity to prove their respective positions with record evidence.

### b.   Retaliation

To state a claim for First Amendment retaliation, a plaintiff must allege that: "(1) he or she engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him or her."  *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (cleaned up).  The Supreme Court recently clarified the contours of the causation element in *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019).  There, the Court held that "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury.  Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive."  *Id.* at 1722.

The plaintiffs allege that they were engaging in protected speech—peacefully protesting in Lafayette Square—when the Arlington defendants (and, in the case of the *Buchanan* plaintiffs, the D.C. defendants) attacked them violently without provocation.  *See* TAC ¶¶ 1, 3; FAC ¶ 57. They allege that the protest was entirely peaceful and that the defendants had no legitimate basis for the violent attack besides animus toward the protestors and their message.  *See* FAC ¶ 8 (alleging that it "seems [the protestors] were removed simply because they were offering a message of racial justice and equality different from the President's.").  Likewise, the plaintiffs allege that the D.C. defendants who sprayed chemical agents on the fleeing crowd a block away from Lafayette Square did so to disrupt the protestors' racial justice demonstration.  *See* TAC ¶

223 (alleging that the D.C. defendants' "actions were based on and/or taken in retaliation for the viewpoint being expressed by the demonstrators").

To be sure, the plaintiffs do not allege any explicit evidence indicating that the individual Arlington and D.C. defendants held personal animus against the plaintiffs' exercise of protected speech. *See generally* FAC, TAC. Rather, they argue that, given the extreme nature of the defendants' actions, plus the shifting and insufficient explanations therefore, "the only reasonable inference from Defendants' conduct is that they forcibly dispersed protesters . . . in retaliation for Plaintiffs' exercise of protected First Amendment activity." FAC ¶ 120. Of course, direct evidence of retaliatory animus is not required, especially at this early stage of the proceedings. "Causation may be inferred—especially at the pleading stage—when the retaliatory act follows close on the heels of the protected activity." *BEG Invs., LLC v. Alberti*, 144 F. Supp. 3d 16, 22 (D.D.C. 2015) (internal quotation marks omitted). Because of the defendants' shifting explanations for the clearing, at this early stage, the plaintiffs have plausibly alleged that the defendants did not have a non-retaliatory motive for their actions and that they reacted with overwhelming force disproportionate to any rational need. *See* TAC ¶¶ 4, 8, FAC ¶ 9; Hrg. Tr. at __ (*Black Lives Matter* plaintiffs noting shifting justifications). Therefore, the plaintiffs have sufficiently alleged a claim of First Amendment retaliation.

Having found a plausible allegation of a constitutional violation, the Court must consider whether the right alleged to be violated was clearly established at the time. No doubt, the general right to be free from retaliation for protected speech is clearly established. *See Reichle v. Howards*, 566 U.S. 658, 665 (2012); *Hartman v. Moore*, 547 U.S. 250, 256 (2006). But the Supreme Court has held that such a formulation draws the question at too high a level of generality. *Id.* ("Here, the right in question is not the general right to be free from retaliation for

one's speech, but the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause.").

The appropriately tailored question is whether a peaceful protestor has the right to be free from government violence in retaliation for the message of their protest. The Court finds that every reasonable officer would have been aware of such a right on June 1, 2020. *See Wesby*, 138 S. Ct. at 589. In *Quraishi v. St. Charles County, Missouri*, 986 F.3d 831 (8th Cir. 2021), the Eighth Circuit decided a case highly analogous to this one and held that a "robust consensus of cases of persuasive authority" clearly established that deploying a tear-gas canister without warning at peaceful reporters at a police brutality protest violated the right to be free from First Amendment retaliation. *Id.* at 839. So too here.

Even if the case law were insufficient to provide notice, though, the right to be free from government violence for the peaceful exercise of protected speech is so fundamental to our system of ordered liberty that it is "beyond debate." *Wesby*, 138 S. Ct. at 589; *see Edwards*, 372 U.S. at 235 (finding that peaceful protestors "reflect an exercise of [] basic constitutional rights in their most pristine and classic form"). Taking the facts as alleged, this is the "rare obvious case where the unlawfulness of the officer's conduct is sufficiently clear even [if] existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590 (internal quotation marks omitted); *see Browder v. City of Albuquerque*, 787 F.3d 1076, 1082–83 (10th Cir. 2015) (Gorsuch, J.) (reasoning that "some things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing").

As noted above, the parties will have the opportunity to attempt to prove and rebut their claims at the discovery stage. And record evidence gathered during discovery will shed light on

whether the defendants had a legitimate, non-retaliatory justification for their actions on June 1, 2020. At this early stage, taking the alleged facts as true, the plaintiffs have alleged enough to overcome qualified immunity and survive the motions to dismiss.

a.   Viewpoint Discrimination

Finally, the plaintiffs raise the separate point that the defendants violated their First Amendment rights by discriminating against them based on their viewpoint. *See* Pls.' Opp'n to Def. Barr et al. at 38–39, Dkt. 98 (No. 1469). Though viewpoint discrimination can violate clearly established rights to First Amendment exercise, the plaintiffs have failed to connect clearly established law to the more specific facts at issue here.

The plaintiffs rely heavily on *Mahoney v. Babbitt*, 105 F.3d 1452 (D.C. Cir. 1997), where the court held that the National Park Service violated the First Amendment by threatening to arrest demonstrators who spoke out against President Clinton's veto of a bill banning partial birth abortions at President Clinton's inauguration. *Id.* Critically, the Service did not threaten demonstrators espousing *other* viewpoints, and actually admitted that it discriminated on the basis of viewpoint. *Id.* at 1456. But that case is quite different than this one, where the plaintiffs allege that the defendants cleared *all* protestors from Lafayette Square. *See, e.g.*, TAC ¶ 206 (describing the purported class as "[a]ll individuals present at Lafayette Square").

The plaintiffs attempt to overcome this fact by arguing that there were no counter protests present, so the entire crowd held the same viewpoint. *See* Pls.' Opp'n to Fed. Defs. at 57, Dkt. 51 (No. 1542). But they provide no support for the seemingly novel proposition that restricting the speech of an entire crowd, without *any* differentiation as to viewpoint between crowd members, can constitute viewpoint discrimination simply because the members of the crowd are presumed to hold homogenous views. Rather, the plaintiffs appear to base their viewpoint

discrimination argument on tweets by former President Trump.  *See* TAC ¶¶ 53–64.  In particular, they compare President Trump's tweets criticizing protestors with tweets praising demonstrators in favor of his own viewpoints.  *See id.*; Pls.' Opp'n to Defs. Barr et al (No. 1469). These allegations are of little relevance to the qualified immunity analysis here, though, as they do not relate to the Arlington or D.C. defendants.  And to defeat qualified immunity, a plaintiff must allege that "each [defendant,] through the official's *own* individual actions, has violated the Constitution."  *Elkins v. District of Columbia*, 690 F.3d 554, 564 (D.C. Cir. 2012) (emphasis added).

ii.      The Fourth Amendment

The plaintiffs also bring Fourth Amendment claims against the D.C. and Arlington defendants for unreasonable seizures conducted with excessive force.  The plaintiffs have not, however, pointed to a violation of any clearly established Fourth Amendment right that can overcome the defendants' entitlement to qualified immunity.  Taking the facts in the light most favorable to the plaintiffs, the officers attacked and improperly *dispersed* the protesters—they did not restrain them or attempt to seize them in place.  *See* TAC ¶¶ 83–101; *contra Horse v. District of Columbia*, No. 17-cv-01216 (D.D.C. Sept. 27, 2019) (law enforcement officers detained and handcuffed protestors).  Indeed, quite the opposite was true—the officers attempted to cause the protestors and fleeing crowd to leave their location, rather than cause them to remain there.  *See* TAC ¶¶ 83–101.  And the plaintiffs allege that they all did in fact leave Lafayette Square.  *See* FAC ¶¶ 84–85 (alleging that plaintiff Field "walked away from the barricades" and then "continued to walk away from the police and military's attack").  These alleged facts lie in stark contrast to the Supreme Court's recent holding that "the application of physical force to the

body of a person *with intent to restrain* is a seizure even if the person does not submit and is not subdued." *Torres v. Madrid*, 141 S. Ct. 989, 1003 (2021) (emphasis added).

One could make the argument that, although the plaintiffs were not physically restrained, their freedom of movement was restrained because the defendants sought to route them in certain directions. But even assuming that the plaintiffs were seized by being forced to leave Lafayette Square, the plaintiffs have not pointed to a case clearly establishing that attempting to move members of a crowd (rather than keep them in a location) can constitute a seizure. And where assessing qualified immunity in the context of the Fourth Amendment, the Supreme Court has repeatedly "stressed the need to *identify a case* where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Wesby*, 138 S. Ct. 577 at 590 (emphasis added).

In an effort to ground their claim in relevant precedent, the plaintiffs point out that "Supreme Court and Circuit precedent hold[s] that even a momentary limitation of a person's freedom of moment is a seizure if it results from means intentionally applied." Pls.' Opp'n at 3, Dkt. 98 (No. 1469); *see also id.* at 55. But this frames the issue at far too high a level of generality, which the Supreme Court has repeatedly instructed against. *See, e.g.*, *White v. Pauly*, 137 S. Ct. 548, 552 (2017) ("Today, it is again necessary to reiterate the longstanding principle that clearly established law should not be defined at a high level of generality.") (internal quotation marks omitted). The relevant question is not whether a momentary use of force can constitute a seizure—of course, it can—but whether the use of tear gas to move members of a crowd can constitute a seizure. Because the plaintiffs have pointed to no case clearly establishing an answer to that question, the defendant officials are entitled to qualified immunity.

iii.    The Fifth Amendment

The *Buchanan* plaintiffs allege that the defendants violated their right to substantive due process under the Fifth Amendment.  FAC at 45–46 (Third Cause of Action).  Specifically, they allege that "[b]y violently attacking unarmed protesters engaged in expressive conduct, Defendants have engaged in conduct that was so egregious, so outrageous that it may fairly be said to shock the contemporary conscience . . . and therefore constitutes excessive force in violation of the Due Process Clause of the Fifth Amendment."  *Id.* ¶ 134 (citation and internal quotation marks omitted).

As an initial matter, the Fifth Amendment does not apply to the Arlington defendants, as they are not federal actors.  After all, "actions of the *federal* government are reviewed under the Fifth Amendment."  *United States v. Al-Hamdi*, 356 F.3d 564, 573 n.11 (4th Cir. 2004) (emphasis added).  "Regardless, the standards employed by the Supreme Court in analyzing due process claims under the Fourteenth Amendment apply with equal force to claims raised under the Fifth Amendment."  *Id.*  And "the Due Process Clause, whether it be the one found in the Fifth Amendment or the Fourteenth Amendment, protects individuals from deprivations of due process by state actors."  *Fennell v. AARP*, 770 F. Supp. 2d 118, 132 (D.D.C. 2011).

To violate the dictates of due process, the alleged conduct must be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998).  The D.C. Circuit has outlined four "sensible guidelines," *Norris v. District of Columbia*, 737 F.2d 1148, 1150 (D.C. Cir. 1984), to evaluate whether government action shocks the conscience: [(1)] "the need for the application of force, [(2)] the relationship between the need and the amount of force that was used, [(3)] the extent of injury inflicted, and [(4)] whether force was applied in a good faith effort to maintain or restore

discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* (internal quotation marks omitted).

Important here, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Cnty. of Sacramento*, 523 U.S. at 842 (internal quotation marks omitted); *see also Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 541 (D.C. Cir. 2015) (holding that because the plaintiff's "claim of illegal seizure is cognizable under the Fourth Amendment," it "therefore cannot proceed under the doctrine of substantive due process"). And a claim need not be certain to succeed under the more specific amendment to foreclose substantive due process analysis. "Substantive due process analysis is . . . inappropriate," *Cnty. of Sacramento*, 523 U.S. at 843, when the plaintiffs' claims are "*covered by*" a more specific amendment, *id.* (emphasis added). As discussed above, the First Amendment's protection against restrictions on speech and retaliation on the basis of speech provides "an explicit textual source of constitutional protection" for the conduct alleged here. *Id.* at 842 (internal quotation marks omitted). Thus, "the more generalized notion of substantive due process" cannot provide a basis for relief. *Id.* (internal quotation marks omitted).

### 4.   *Section 1983 Municipal Liability*

Finally, the plaintiffs bring claims for municipal liability, alleging that the District of Columbia and Arlington County were deliberately indifferent in failing to train their officers about the use of chemical irritants against protesters. *See* FAC ¶¶ 152–154; TAC ¶¶ 275, 281.

To state a claim for municipal liability, a plaintiff must allege that the municipality followed a "policy or custom" that resulted in the constitutional injury. *See Monell v. Dep't of*

*Soc. Servs. of City of New York*, 436 U.S. 658, 691–94 (1978).  Under this rule, "a municipality

can be liable under § 1983 only where its policies are the moving force [behind] the

constitutional violation."  *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989) (internal

quotation marks omitted).  The plaintiffs must allege either (1) an express municipal policy; (2)

actions of a final municipal policymaker; (3) custom with the force of law; or (4) deliberate

indifference, which can include a failure to train.  *Baker v. District of Columbia*, 326 F.3d 1302,

1306 (D.C. Cir. 2003).

      Here, the plaintiffs do not allege that the municipalities followed an express policy to

improperly deploy chemical irritants and other force on protestors.  *See generally* TAC; FAC.

Rather, they allege that the District of Columbia "fail[ed] to train or supervise" officers, TAC ¶

275, and was "deliberately indifferent to the risk of constitutional violations," *id.* ¶ 281.  "In

limited circumstances, a local government's decision not to train certain employees about their

legal duty to avoid violating citizens' rights may rise to the level of an official government policy

for purposes of § 1983."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  But the Supreme Court

has made clear that "deliberate indifference" in this context requires a significant showing.

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor

disregarded a known or obvious consequence of his action."  *Id.* at 61 (internal quotation marks

omitted).  "To adopt lesser standards of fault and causation would open municipalities to

unprecedented liability under § 1983," because "[i]n virtually every instance where a person has

had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to

point to something the city "could have done" to prevent the unfortunate incident."  *City of

Canton*, 489 U.S. at 391–92 (1989).  For these reasons, "[a] municipality's culpability for a

deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*,
563 U.S. at 61.

    As support for D.C.'s alleged failure to train its officers, the *Black Lives Matter* plaintiffs
point to five past incidents, unrelated to the Lafayette Square events, in four of which the
Metropolitan Police Department used chemical irritants on crowds. *See* TAC ¶¶ 110, 113. The
incidents span a period of twenty years. *Id.* The *Buchanan* plaintiffs, meanwhile, cite a news
article which asserts that use-of-force incidents by MPD officers has steadily increased in the last
five years, *see* FAC ¶ 154, and point to the MPD's response to protestors during the 2017
inauguration, where "police pinned hundreds of protesters into city blocks, used frequent flash-
bang grenades, and heavily deployed tear gas," *id.*

    The *Buchanan* plaintiffs do not provide specific allegations as to Arlington County's
policies or customs, *see generally* FAC ¶¶ 152–58, but instead conclude in their briefing that
"Arlington County was deliberately indifferent when it failed to properly train . . . Arlington law
enforcement officers, on how to appropriately provide mutual aid at the June 1, 2020 Lafayette
Park protest." Pls.' Opp'n to Def. Vincent at 38, Dkt. 50 (No. 1542). They argue that "President
Trump publicly urged a violent and aggressive law enforcement response," *id.*, and "[i]n light of
these statements, and the nature of the preceding protests, Arlington County should have known
that the Arlington Defendants needed to receive 'more or different' training on the use of force at
upcoming protests."[13] *Id.*

---

[13] These allegations are plainly insufficient. The plaintiffs only point to former President's
Trump's public statements—they allege no pattern or practice by Arlington County itself and
provide no specific allegations as to how its specific training program failed. *See* FAC ¶¶ 152–
58. The plaintiffs alternatively request leave to amend, asserting that they would allege that
"complaints against ACPD police personnel rose by 55 percent between 2018 and 2019." Pls.'
Opp'n at 39, Dkt. 50 (No. 1542). But even accepting that proffer, a single allegation about use

Accepting these allegations as true, these isolated incidents over the course of two decades in a metropolis as large as Washington D.C. are insufficient to meet the high bar for alleging a municipal policy or custom, as they are too far removed in time to be "so persistent and widespread as to practically have the force of law." *Page v. Mancuso*, 999 F. Supp. 2d 269, 284 (D.D.C. 2013) (internal quotation marks omitted); *see, e.g.*, *Peterson v. City of Fort Worth*, 588 F.3d 838, 852 (5th Cir. 2009) (finding 27 incidents of excessive force over a period of four years in Fort Worth to "not reflect a pattern that can be said to represent official policy of condoning excessive force so as to hold the City liable for the acts of its employees' unconstitutional conduct"); *Ramos v City of Chicago*, 707 F. Supp. 345, 347 (N.D. Ill. 1989) ("[A]lleging six incidents of police brutality over a ten year period in a city as large as Chicago with a police force in excess of 10,000 members is unremarkable, and in no way indicates a policy or custom.").

What is more, many of these alleged incidents are too far removed from the specific facts alleged here to have put the District on constructive or actual notice of a failure in training. *Connick* is instructive.  563 U.S. 51.  There, the plaintiffs argued that a prosecutor's office had failed to train its prosecutors on *Brady* violations by pointing out that "during the 10 years preceding his armed robbery trial, Louisiana courts had overturned four convictions because of *Brady* violations by prosecutors in Connick's office."  *Id.* at 62.  The Court rejected this argument, holding that "[t]hose four reversals could not have put Connick on notice that the office's *Brady* training was inadequate with respect to the sort of *Brady* violation at issue here

---

of force in general is not particularized enough to the facts here to imply a policy or custom on the part of Arlington County to unlawfully use chemical irritants and force against protestors. Thus, any such amendment would be futile.  *SAI v. DHS*, 149 F. Supp. 3d 99, 126 (D.D.C. 2015); *see also Hettinga*, 677 F.3d at 480 (affirming denial of leave to supplement on futility grounds).

[since] [n]one of those cases involved failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind." *Id.* at 62–63.  In other words, the previous incidents were not sufficiently tailored to the precise failure at issue.  Such is the case here, where the *Buchanan* plaintiffs point to evidence that the MPD increased its use of force *generally*.  *See* FAC ¶ 154.  They provide only one prior incident specific to protestors, the 2017 inauguration. *Id.*  Even the *Black Lives Matter* allegations, which are tailored to protests, only cite three incidents that relate in any way to the White House or presidential events.  *See* TAC ¶ 110 (alleging that MPD used "excessive force against demonstrators during the counter-inaugural demonstrations near the White House in January 2005," and "used excessive force against and unconstitutionally detained demonstrators during the counter-inaugural demonstrations in Adams Morgan in January 2005").  And of those incidents, only one is alleged to have involved protestors near the White House, a critical fact here.  *Id.*  Although other Courts have found past incidents of MPD use of tear gas to be sufficient to state a claim for municipal liability, *see, e.g.*, *Horse v. District of Columbia*, No. 17-cv-01216 (D.D.C. Sept. 27, 2019), the Court finds here that these particular allegations are insufficiently similar.  "Because [the majority of alleged] incidents are not similar to the violation at issue here, they could not have put [the District] on notice that specific training was necessary to avoid this constitutional violation."  *Connick*, 563 U.S. at 62.

Accordingly, the municipal liability claims will be dismissed.

***

At this preliminary stage, without a factual record, the Court's rulings are based solely on the allegations in the complaints.  Before either party has had an opportunity for discovery, it would be premature for the Court to draw any conclusions about why Lafayette Square was cleared on June 1 or whether the law enforcement officers' actions were justified.  The parties will have an opportunity to litigate the facts after discovery.

Taking the allegations of the complaint as true, as the Court must when ruling on a motion to dismiss, the plaintiffs have plausibly stated a claim under 42 U.S.C. § 1983 for First Amendment violations by Arlington County and District of Columbia officials.  According to the complaints, the defendants used force, without warning, to break up a crowd of peaceful protestors who were exercising their First Amendment rights in Lafayette Square, a historic and "quintessential public forum," *Doe*, 968 F.2d at 87, which provides a unique situs for the exercise of First Amendment rights," *A Quaker Action Grp.*, 516 F.2d at 725.  As alleged, the defendants prohibited all expressive activities in Lafayette Square without any basis at all; they left open no alternative channels; and they forcibly dispersed protestors because of the plaintiffs' exercise of their protected First Amendment rights.  Reasonable officers would have known that such alleged actions violated clearly established law.  Thus, the plaintiffs' claims for damages against the Arlington County and D.C. officials survive the motions to dismiss.

The plaintiffs' *Bivens* claims for damages against the federal defendants do not.  Unlike state officials, federal officials are not subject to the remedies of 42 U.S.C. § 1983.  Supreme Court precedent dictates that the Court not extend a damages remedy against federal officials to a "new context," *Abbasi*, 137 S. Ct. at 1859, like this one, where national security interests are implicated and alternative remedies exist, *id.*

One claim for equitable relief against the federal defendants survives.  The plaintiffs have

standing to challenge the continued restrictions on access to Lafayette Square because they have plausibly alleged an ongoing injury.  To this day, over a year after the events of June 1, Lafayette Square remains subject to heightened restrictions that periodically limit protestors' access to the Square.  Despite the change in Administrations, the federal defendants have not met the high bar of showing that this claim has been mooted by subsequent events.

Finally, the plaintiffs' remaining claims for injunctive relief are dismissed for lack of standing, and their remaining statutory claims are dismissed for failure to state a claim.

## CONCLUSION

For the foregoing reasons, the motions to dismiss are granted in part and denied in part. A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

June 21, 2021